IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**FILED**

JUL 2 3 2020

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **I N D I C T M E N T** |
| | ) | |
| Plaintiff, | ) | **1:20  CR  392** |
| | ) | |
| v. | ) | CASE NO._____ |
| | ) | |
| CHARLES VACCARO, | ) | Title 15, United States Code, |
| DROR SVORAI, | ) | Sections 78j(b), 78ff; Title 18, |
| DENNIS RUGGERI, | ) | United States Code, Sections |
| | ) | 371, 981, 1349,1343, and 2; |
| Defendants. | ) | Title 26, United States Code, |
| | ) | Section 2461; Title 17, Code of |
| | ) | Federal Regulations, Section |
| | ) | 240.10b-5 |

**JUDGE OLIVER**

<u>GENERAL ALLEGATIONS</u>

At all times material to this Indictment:

**A.** **<u>Defendants</u>**

1.     Defendant CHARLES VACCARO ("VACCARO") was a resident of Florida.

VACCARO was a registered broker with The Financial Industry Regulatory Authority

("FINRA") until in or around 2015 when FINRA suspended VACCARO.

2.     Defendant DROR SVORAI ("SVORAI") was a resident of Florida.

3.     Defendant DENNIS RUGGERI ("RUGGERI") was a resident of Florida.

**B.** **<u>Relevant Entities, and Bank Accounts</u>**

4.     Sign N Drive Auto Mall, Inc. ("Sign N Drive") was incorporated on or about

March 27, 2014, as a New York corporation with its principal place of business in Sunny Isles

Beach, Florida.  VACCARO was listed as the president.  On or about September 10, 2015, JP

Morgan Chase Bank account number x5389 was opened in the name of Sign N Drive. VACCARO was the sole authorized signer on the account.

5.      Sunny Isles Capital, LLC ("Sunny Isles Capital") was registered on or about October 19, 2017, as a Florida limited liability company with its principal place of business in Sunny Isles Beach, Florida.  VACCARO was the registered agent and the "authorized person" was Sign N Drive.  C Weed Capital, LLC, a predecessor to Sunny Isles Capital, LLC, was a Florida limited liability company.  On or about November 7, 2017, JP Morgan Chase Bank account x1370 was opened in the name C Weed Capital LLC.  VACCARO was the sole authorized signer on the account.

6.      C Weed Yacht Charter, LLC ("C Weed Yacht Charter") was registered on or about September 15, 2017, as a Florida limited liability company with its principal place of business in Sunny Isles Beach, Florida.  On or about October 23, 2017, JP Morgan Chase Bank account number x8185 was opened in the name of C Weed Yacht Charter.  VACCARO was the sole authorized signer on the C Weed Yacht Charter bank account.  VACCARO maintained *de facto* control of the business, its accounts, and its transactions.

7.      Back Nine Capital, LLC ("Back Nine Capital") was a Florida limited liability company with its principal place of business in Delray Beach, Florida.  Co-Conspirator-3 was listed as the manager.  Back Nine Capital was formed in approximately 2018.  On or about July 9, 2018, JP Morgan Chase Bank account number x7261 was opened in the name of Back Nine Capital.  Co-Conspirator-3 was the sole authorized signer on the Back Nine Capital bank account.  VACCARO and Co-Conspirator-3 maintained de facto control of the business accounts, and its stock trades and transactions.

8.     D&D Capital, Inc. ("D&D Capital") was registered on or about May 28, 2009, as a Florida corporation with its principal place of business in Miami, Florida. Nominee-2 was listed as the president. SVORAI maintained de facto control of the business and its stock trades and transactions. On or about August 24, 2009, Wachovia Bank account number x9454 was opened in the name of D&D Capital. SVORAI and Nominee-2 were the authorized signers on the bank account. On or about March 12, 2012, SVORAI was removed as an authorized signer on the bank account, which was now held at Wells Fargo Bank. SVORAI maintained *de facto* control of the business account and its transactions.

9.     S&E Capital, LLC ("S&E Capital") was registered on or about October 24, 2006, as a Florida limited liability company with its principal place of business in Sunny Isles, Florida. Nominee-3 was the "authorized person." On or about September 14, 2010, Wachovia Bank account number x9331 was opened in the name of S&E. SVORAI and Nominee-3 were the authorized signers on the bank account number. On or about November 4, 2014, SVORAI was removed as an authorized signer on the bank account. SVORAI maintained *de facto* control of the business' bank accounts, its stock trades, and transactions.

10.     Nominee 5's Company was registered on or about January 18, 2017, as a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida. Nominee-5 was listed as manager and Co-Conspirator-8 was listed as the Chief Legal Officer. On or about January 31, 2017, JP Morgan Chase Bank account numbers x5685 and x6089 were opened in the name of Nominee 5's Company. Co-Conspirator-1 and Co-Conspirator-8 were the authorized signers on the bank accounts.

11.     Investor Capital, LLC ("Investor Capital") was registered on or about May 24, 2017, as a Delaware limited liability company with its principal place of business in Wilmington,

Delaware. Co-Conspirator-1 was listed as manager. On or about May 26, 2017, JP Morgan Chase Bank account number x7519 was opened in the name of Investor Capital. Co-Conspirator-1 was the sole authorized signer on the bank account.

12. One Investment Capital, Inc. ("One Investment Capital") was incorporated on or about February 7, 2018, as a Delaware corporation with its principal place of business in Wilmington, Delaware. Co-Conspirator-1 was listed as the president. On or about February 26, 2018, JP Morgan Chase Bank account number x5316 was opened in the name of One Investment Capital. Co-Conspirator-1 was the sole authorized signer on the bank account.

13. Novelties Distribution LLC, ("Novelties Distribution") was incorporated on or about May 4, 2017, as a Florida corporation with its principal place of business in Sunrise, Florida. Nominee-6 was the sole registered agent and manager of Novelties Distribution. On or about May 8, 2017, JP Morgan Chase Bank account number x2059 was opened in the name of Novelties Distribution. Co-Conspirator-1 was sole authorized signer on the bank account.

14. Nominee-7's Company was incorporated on or about January 29, 2019, as a Florida corporation with its principal place of business in Sunrise, Florida. Nominee-7 was listed as the president and director. On or about February 14, 2019, JP Morgan Chase Bank account number x1237 was opened in the name of Nominee-7's Company. Nominee-7 owned shares in POTN, which were sold and transferred to unregistered brokers. Approximately one week after the corporate account was established, Co-Conspirator-1 was added as an authorized signer on the corporate bank account and proceeds of the POTN sales were deposited and subsequently transferred into an account controlled by Co-Conspirator-1.

15. Distribution Wholesale, Inc. ("Distribution Wholesale") was incorporated on or about July 1, 2015, as a Florida corporation with its principal place of business in Fort

4

Lauderdale, Florida.  Co-Conspirator-8 was listed as the president.  On or about August 26, 2016, JP Morgan Chase Bank account number x3366 was opened in the name of Distribution Wholesale.  Co-Conspirator-1 was not listed as an authorized signer on the account.

**C.**   **Relevant Publicly Traded Companies**

16.   PotNetwork Holdings, Inc. ("PotNetwork" or "POTN") was a publicly-traded Colorado corporation with its principal place of business in Fort Lauderdale, Florida.  It was incorporated in Wyoming in approximately 2004 under the name MyMedicalCD, Ltd.  The company also previously operated under the names SND Auto Group, Inc. ("SND"), Element Trading Holdings, Inc. ("ELEMENT"), United Treatment Centers, Inc. ("United"), PHI Transition Corporation, and Hemp Biotech, Inc.  VACCARO was listed as the president of ELEMENT.  Sunrise Auto Mall Inc. ("Sunrise"), a Florida corporation dissolved in approximately 2017 with VACCARO listed as its president, was the wholly owned subsidiary of United.  When United changed its name to PotNetwork, the stock traded under the ticker symbol "POTN."  PotNetwork purported to conduct its operations through its two wholly owned subsidiaries, First Capital Venture Co., and PotNetwork Media Group, Inc.  PotNetwork purported to be a holding company whose subsidiaries sell numerous CBD oil products, and operate www.potnetwork.com, an informational website about the cannabis industry.  PotNetwork marketed itself on its website as being focused on the booming cannabis industry.

17.   Vapor Group, Inc. ("Vapor" or "VPOR") was a publicly-traded Florida corporation with its principal place of business in Daytona Beach, Florida.  It was incorporated in approximately 1990 under the name Creemore Star Printing, Inc.  The company also previously operated under the names Smitten Press: Local Lore and Legends, Inc., DataMill Media Corp., AvWorks Aviation Corp.  Vapor was a microcap or penny stock, the shares of

which were traded under the ticker symbol "VPOR" on OTC.  Vapor purported to operate through its wholly owned subsidiary, VPOR, Inc., a bulk wholesaler of high quality, raw hemp-derived CBD in a range of forms.

18.     CLIC Technology, Inc. ("CLCI") was a publicly-traded Nevada corporation with its principal place of business in Aventura, Florida.  It was incorporated under the name FundThatCompany.  CLCI was a microcap or penny stock, the shares of which were traded under the ticker symbol "CLCI" on OTC.  CLCI purported to operate as a developer, integrator, and marketer of blockchain products and services.

19.     White Label Liquid, Inc. ("White Label Liquid" or "WLAB") was a publicly-traded Wyoming corporation with its principal place of business in Cheyenne, Wyoming.  It was incorporated in approximately 2013 under the name Simply Lids.  The company also previously operated under the names Coastal Integrated Services, Inc., and Simply Innovative Products, Inc.  White Label Liquid was a microcap or penny stock, the shares of which were traded under the ticker symbol "WLAB" on OTC.  White Label Liquid purported to be a manufacturer of e-liquids and hemp derived CBD products.

20.     Canna Corporation ("Canna" or "CNCC") was a publicly-traded Colorado Corporation with its principal place of business at 20200 W. Dixie Highway, Suite 906, Miami, Florida 33180.  It was incorporated in approximately 2013 under the name Rich Cigars Inc.  The company also previously operated under the names Intercontinental Technology, Inc., First Intercontinental Technology, Inc. and Mining Power Group, Inc.  Canna was a microcap or penny stock, the shares of which were traded under the ticker symbol "CNCC" on OTC.

21.     Grand Capital Ventures, Inc. ("Grand Capital" or "GRCV") was a publicly-traded Florida Corporation with its principal place of business in North Miami, Florida.  It was

incorporated in approximately 1991 under the name Crowne Ventures, Inc. Grand Capital was a microcap or penny stock, the shares of which were traded under the ticker symbol "GRCV" on OTC. Grand Capital purported to focus on startup and early stage companies and acquired a company and became an e-commerce company.

22. Stock for PotNetwork, Vapor, CLCI, White Label Liquid, Canna, and Grand Capital ("the Manipulated Public Companies") were quoted on OTC Markets, Inc. ("OTC Markets"), an inter-dealer quotation service that provided quotations, prices, and financial information for certain over-the-counter securities and issuers. Companies trading on OTC Markets tended to be very small, and the stock tended to be closely held (i.e., owned by a small number of individuals) and thinly traded (that was, traded far less frequently than stocks in larger companies on larger exchanges).

**D.**   **The Roles in the Manipulated Public Companies**

23. VACCARO controlled a substantial number of outstanding, restricted, and free-trading shares of POTN, CLCI, WLAB and CNCC through his personal companies, co-conspirators, and associates over which he had influence and control. VACCARO used co-conspirators and nominees to acquire outstanding shares and purchase convertible notes.

24. SVORAI controlled a substantial number of outstanding, restricted, and free-trading shares of VPOR, GRCV, and CNCC through his personal companies, co-conspirators, family members, and associates over which he had influence and control. SVORAI used co-conspirators and nominees to acquire outstanding shares and purchase convertible notes.

25. RUGGERI purportedly worked for companies whose shares were controlled by VACCARO, Co-Conspirator-1, and SVORAI. RUGGERI assisted VACCARO, Co-Conspirator-1, SVORAI and others to conceal control and ownership of the stock in the Manipulated Public Companies, by among other things, providing false documentation to

financial regulators, brokerage firms, and transfer agents. RUGGERI provided false documentation on behalf of VACCARO, Co-Conspirator-1, SVORAI and others to assist with the deposit and sale of securities for the benefit of RUGGERI and the other co-conspirators.

i.     Co-Conspirators

26.     Co-Conspirator-1 controlled a substantial number of outstanding, restricted, and free-trading shares of POTN, VPOR, CLCI, WLAB, and CNCC through Co-Conspirator-1's personal companies, co-conspirators, family members, and through associates over which Co-Conspirator-1 had influence and control. Co-Conspirator-1 used co-conspirators and nominees to acquire outstanding shares and purchase convertible notes. Co-Conspirator-1 and VACCARO also arranged a profit sharing agreement on a POTN convertible note.

27.     Co-Conspirator-2 held a convertible note in CNCC and purchased free trading shares of a predecessor of CLCI to assist VACCARO, SVORAI, and Co-Conspirator-1 take control in the Manipulated Public Companies. Co-Conspirator-2 also owned shares of WLAB and shared bank accounts with VACCARO, which were utilized to conceal VACCARO as the beneficiary of account and VACCARO's control over the transactions that occurred in the accounts.

28.     Co-Conspirator-3 held convertible notes to conceal VACCARO's ownership of shares in POTN, WLAB, CLCI, and CNCC and provided false documentation to transfer agents to facilitate the acquisition and attempted deposit and sale of POTN, WLAB, CLCI, and CNCC for the benefit of VACCARO and others.

29.     Co-Conspirator-4 ran Promotion Company-1, which was a "boiler room" promotion services that called and solicited potential investors to purchase shares in POTN. Calls to potential investors typically coincided with the distribution of favorable press releases

and other information that the Defendants caused to be released and provided in advance. Co-Conspirator-4 was paid by VACCARO and Co-Conspirator-1 to tout POTN to Co-Conspirator-4's clientele and was provided with advances of POTN press releases and research reports. Generally, boiler room promoters did not disclose payments they received in exchange for promoting a particular stock.

30.     Co-Conspirator-5 operated an unregistered offshore brokerage firm. VACCARO, SVORAI, RUGGERI, Co-Conspirator-1, Co-Conspirator-2, Co-Conspirator-3, and others, transferred shares of POTN, VPOR, GRCV, CLCI and WLAB to Co-Conspirator-5 to liquidate into the stock market for the benefit of VACCARO, SVORAI, Co-Conspirator-1, and others. Co-Conspirator-5 sold shares of POTN, VPOR and GRCV into the stock market and the proceeds of the sales were laundered into the United States for the benefit of VACCARO, SVORAI, Co-Conspirator-1, and others. Co-Conspirator-5 received compensation, in the form of kickbacks, for selling the shares of the Manipulated Public Companies.

31.     Co-Conspirator-6 was a resident of Florida and Panama who operated an unregistered brokerage firm, hereinafter referred to as Unregistered Brokerage-3. Co-Conspirator-6 purchased and liquidated shares of the Manipulated Public Companies into the stock market for the benefit of VACCARO, SVORAI, and Co-Conspirator-1. Co-Conspirator-6 received compensation, in the form of kickbacks, for selling the shares of the Manipulated Public Companies.

32.     Co-Conspirator-7 was a resident of Puerto Rico and Illinois who operated unregistered brokerages through Unregistered Brokerage-3 and Unregistered Brokerage-4. Co-Conspirator-7 purchased and liquidated shares of the Manipulated Public Companies into the stock market for the benefit of VACCARO, SVORAI and Co-Conspirator-1. Co-Conspirator-7

received compensation, in the form of kickbacks, for selling the shares of the Manipulated Public Companies.

33. Co-Conspirator-8 was a resident of Florida and was the Chief Executive Officer of POTN. Co-Conspirator-8 also purportedly operated Distribution Wholesale, which paid expenses associated with the promotion of the Manipulated Public Companies at the direction of VACCARO, SVORAI and Co-Conspirator-1.

34. Co-Conspirator-9 was a resident of Florida and sold shares of VPOR for SVORAI using a corporate entity owned by Co-Conspirator-9.

35. Co-Conspirator-10 was a resident of Florida and assisted SVORAI in taking control of stock in VPOR and CNCC. Co- Conspirator-10 also served as the CEO of VPOR and CNCC.

ii. Nominee Co-Conspirators

36. Nominee-1 held convertible notes in Element Trading, United Treatment Centers, and PotNetwork, which Nominee-1 later transferred to entities controlled by VACCARO and other co-conspirators.

37. Nominee-2, Nominee-3, and Nominee-4 were members of SVORAI's family, and purportedly worked for companies controlled by SVORAI. Nominee-2, Nominee-3, and Nominee-4 provided false documentation to transfer agents to facilitate the deposit and sale of securities for the benefit of SVORAI and others.

38. Nominee-5, Nominee-6, Nominee-7, and Nominee-8 were members of Co-Conspirator-1's family that purportedly worked for companies controlled by VACCARO and Co-Conspirator-1. Nominee-5, Nominee-6, Nominee-7, and Nominee-8 provided false

documentation to transfer agents to facilitate the deposit and sale of securities for the benefit of Co-Conspirator-1 and others.

       iii.     <u>Registered Brokers</u>

39.     VACCARO, SVORAI, RUGGERI, and others known and unknown to the Grand Jury used registered stock brokerage firms to deposit and sell shares of the Manipulated Public Companies into the open market.  The Defendants typically applied to deposit shares in the names of other shares they controlled, and if accepted, deposited the shares for sale.  If the application was rejected, the Defendants and others acting in concert with them applied to other brokerage firms.  The Defendants deposited and sold shares and attempted to deposit and sell shares, using the brokerage firms Brokerage-1, Brokerage-2, Brokerage-3, Brokerage-4, and others.

       iv.     <u>Unregistered Stock Brokers</u>

40.     VACCARO, SVORAI, RUGGERI, and others acting on their behalf also used unregistered brokers to liquidate and sell free trading shares of stock in the Manipulated Public Companies after they were unable to continue to clear shares with U.S.-based registered brokers. The Defendants paid the unregistered brokers commissions, in the form of kickbacks, for selling the shares of the Manipulated Public Companies into the stock market.  The Defendants deposited and sold shares with unregistered brokerage firms, Unregistered Brokerage-1, Unregistered Brokerage-2, Unregistered Brokerage-3, Unregistered Brokerage-4, and Unregistered Brokerage-5 and others.

       v.     <u>Promoters</u>

41.     VACCARO, SVORAI, RUGGERI, and others used promoters and media companies to solicit potential investors to purchase their shares in the Manipulated Public

Companies. The Defendants dictated what stocks the promoters "pushed." The promotions typically coincided with favorable press releases or other information that the Defendants caused to be released. The Defendants and others acting on their behalf used Promotion Company-2 and Promotion Company-3 to promote the fraudulent stock of the Manipulated Public Companies.

vi.   Attorneys

42.   The Defendants and others provided attorneys with fraudulent information to obtain legal opinions under Title 17, Code of Federal Regulations, Section 230.144, et al., often referred to as Rule 144. These Rule 144 legal opinions contained misrepresentations concerning the relationship between the customer and the issuer, the customer and an affiliate of the issuer, the consideration paid (if any), and other material misrepresentations. The Defendants and others provided these Rule 144 legal opinions to brokerage houses and transfer agents to satisfy legal requirements for depositing the stock and lifting share restrictions.

E.   **The SEC and Securities Regulations**

43.   The United States Securities and Exchange Commission (the "SEC") was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities traded on the United States-based stock exchanges. Stock for the Manipulated Public Companies was registered with the SEC.

44.   Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false and misleading statements and the failure to disclose material information to: (a) the SEC in publicly available filings; (b) brokerage firms and transfer agents involved in the purchase and sale of stock in the companies subject to SEC regulations; and (c) the public. Federal securities laws and regulations also prohibited the

manipulation of stock through, among other things, sales made at the times and at prices set by those trading the stock rather than by market forces.

45.     Failure to disclose to investors the commission payments from third parties, including payments from issuers, was considered an omission of a material fact as part of a securities transaction under federal securities law.

46.     "Kickbacks" were paid to co-conspirators in a variety of ways, including but not limited to, undisclosed commissions for selling shares, retainage of illicit proceeds, and heavily discounted blocks of shares so the co-conspirator could also profit from the manipulated stock.

47.     The term "issuer" in the Securities Act included any person directly or indirectly controlling or controlled by, or any person under direct or indirect common control with, the issuer.

**F.     Relevant Regulatory Principles and Definitions**

48.     "Microcap" or "penny" stocks were stocks of publicly traded U.S. companies with a low market capitalization.  Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that are traded on notable exchanges.  Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

49.     Convertible debt was a form of short-term debt that could be converted into equity.  Small publicly traded companies typically needed money for expenses or capital they normally could not afford.  Issuing convertible debt in the form of notes gave the company instant cash flow for expenses and the lender or future shareholder received the right to convert the note into equity in the company.  There were restrictions and guidelines set forth by

regulating bodies such as the SEC, however, that required certain disclosures associated with these transactions.

50.     Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 made it illegal for anyone to, among other things, employ any scheme to defraud, make an untrue statement or omission of material fact, or engage in any act, practice, or course of business, in connection with the purchase or sale of any security—regardless of whether the registered public company was registered under Section 12 of the Securities Act or required to file reports under Section 15(d) of the Securities Act or "unregistered."

51.     Market manipulation schemes known as "pump and dump" schemes typically involved creating a price for a security that was not reflective of true market value, thereby allowing the Defendants holding large blocks of the inflated stock to sell shares they obtained for little or no money at the inflated price.  The purchasing party was left with a near-worthless security when the price dropped to accurately reflect the stock's true value, or lack thereof, in the market.  There were generally three phases to a pump and dump scheme: (i) obtaining and concealing control of a significant portion of a publicly traded company's stock, (ii) fraudulently inflating or keeping inflated the price and trading volume of the company's stock through a variety of means, including controlling the release of favorable news, directing and coordinating with promoters and co-conspirators by providing press releases and other materials in advance of its release to the public, and obfuscating the parties paying for the promotion; and (iii) after the price of the stock was fraudulently inflated, selling the stock using the fraudulently inflated price as a benchmark, thereby profiting at the expense of the investing public.

## THE SCHEMES TO DEFRAUD

52.     From in and around January 2014, through on or about July 19, 2019, VACCARO, SVORAI, RUGGERI, and others, known and unknown to the Grand Jury, knowingly and intentionally conspired to commit an offense against the United States, that is, Securities fraud, by conspiring and agreeing to defraud investors and potential investors in the Manipulated Public Companies by issuing millions of stock/shares to themselves at little or no cost and then artificially controlling the price and volume of shares by, among other means: (a) using convertible notes to issue debt to themselves or nominees who then converted the debt into freely tradeable shares of the Manipulated Public Companies, thereby fraudulently concealing the Defendants ownership or control interests in the Manipulated Public Companies; and (b) fraudulently engineering price movements and trading volume in the stocks.

53.     VACCARO, SVORAI, RUGGERI, and others, known and unknown to the Grand Jury, also conspired to devise a scheme to fraudulently conceal the proceeds of offshore stock sales in the Manipulated Public Companies by creating and transmitting through interstate wire communications falsified documents purporting to pay a consultant, who, in fact, as they then well knew, was to launder the proceeds of the offshore stock sales back into the United States for the benefit of VACCARO, SVORAI, RUGGERI, and others.

## A.     The Pump: Inflation of the Fraudulent Stock of the Manipulated Public Companies

54.     After gaining control of the Manipulated Public Companies stocks, VACCARO, SVORAI, and RUGGERI, together with others, devised and intended to devise a scheme whereby they fraudulently inflated the Manipulated Public Companies share prices and trading volumes and then orchestrated the sale and purchase of the Manipulated Public Companies stock at a profit.

55.     VACCARO, SVORAI, RUGGERI, and others, sought to manipulate the Manipulated Public Companies stock through promotional media efforts designed to generate public interest and trading volumes in the stock.  Having control of significant amounts of the stock, VACCARO, SVORAI, RUGGERI and others controlled the volume of trading by coordinating the sale of large blocks of shares timed with press releases paid by the company or entities controlled by the Defendants.

56.     VACCARO, SVORAI, and others, had influence and control of the authorship, timing, and content of press releases issued by the Manipulated Public Companies.

57.     VACCARO, SVORAI, and Co-Conspirator-1 directed payments for promotion of POTN, WLAB, CLCI, VPOR and GRCV to be paid directly and indirectly from nominee corporation bank accounts to conceal the identity of the individuals touting the stock.

58.     During the periods when the Manipulated Public Companies' stock was being promoted and manipulated, the value of the stocks had little or no relation to their actual current and future earnings potential or business operations.

**B.     The Dump: Profits at Investors' Expenses**

59.     VACCARO, SVORAI, RUGGERI, and others known and unknown to the Grand Jury, obtained millions of shares in the Manipulated Public Companies at little or no cost and then profited by selling their own shares in PotNetwork, Vapor, CLCI, White Label Liquid, Canna, and Grand Capital stock to investors at fraudulent and artificially inflated prices without disclosing that they controlled the shares being sold into the market and their relationship with and control of the Manipulated Public Companies.  Little, if any, portion of the investments went to fund the operations of the Manipulated Public Companies.  Rather, VACCARO, SVORAI, RUGGERI and others used most of the investments to enrich themselves.

<u>STATUTORY VIOLATIONS</u>

<u>COUNT 1</u>
(Conspiracy to Commit Securities Fraud, 18 U.S.C. § 371)

The Grand Jury charges:

60.     The allegations contained in paragraphs 1 through 59 are re-alleged and incorporated as though fully set forth herein.

61.     From in or around January 2014, through on or about July 19, 2019, within the Northern District of Ohio, Eastern Division, and elsewhere, defendants CHARLES VACCARO, DROR SVORAI, and DENNIS RUGGERI, together with others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree with each other to commit offenses against the United States, to wit:

a.     To knowingly and willfully, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by: (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made false statements of material fact and omitting material facts that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of PotNetwork Holdings, Inc., Vapor Group, Inc., CLIC Technology, Inc., White Label Liquid, Inc., Canna Corporation, and Grand Capital Ventures, Inc.'s securities, in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud); and

17

b.      To knowingly and willfully, by the use of the mails and any means and instrumentality of interstate commerce, and of any facility of any national securities exchange, for the purpose of creating a false and misleading appearance of active trading in any security other than a government security, and a false and misleading appearance with respect to the market for any such security, (a) entering an order and orders for the purchase of such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been and will be entered by and for the same and different parties, and (b) entering any order and orders for the sale of any such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been and will be entered by and for the same and different, parties, in violation of Title 15, United States Code, Sections 78i(a)(1) and 78ff (Manipulative Securities Trading).

## OBJECTS OF THE CONSPIRACY

62.     The objects of the conspiracy included, but were not limited to: (1) defrauding the investors; (2) obtaining investor monies and pay and receive undisclosed commissions; (3) inflating the value of the Manipulated Public Companies; and (4) enriching the conspirators.

## MANNER AND MEANS

63.     It was part of the conspiracy that:

a. VACCARO, SVORAI, and others, obtained control of public "shell" companies, and executed sales and mergers of businesses with the shells to create publicly traded companies.

b. VACCARO, SVORAI, and others, controlled existing debt of the publicly traded companies and indebted those companies using convertible notes they ultimately controlled, and then converted the notes into free-trading, unrestricted shares.

c. VACCARO, SVORAI, and others, sold those shares into the market while concealing that they, in fact, controlled the shares and the stock of the Manipulated Public Companies.

d. VACCARO, SVORAI, RUGGERI, and others, used manipulative stock trading techniques, such as transferring convertible notes and large blocks of shares to nominees and other entities they controlled, to conceal their control of the stock in the Manipulated Public Companies.

e. VACCARO, SVORAI, and others, were authorized signers on the bank accounts for nominees and other entities they controlled in order to transfer proceeds of the sale of shares of the Manipulated Public Companies and paid expenses, such as payments, to promoters.

f. VACCARO, SVORAI, RUGGERI, and others, tracked the ownership percentage of their nominees and entities they controlled to ensure that each nominee stayed below certain reporting thresholds to further conceal the true control of the Manipulated Public Companies.

g. VACCARO, SVORAI, and others, sold, at a discount, large blocks of shares in the Manipulated Public Companies to co-conspirators who were aware of the stock manipulation scheme in order for the co-conspirators to profit when the stocks were promoted and for the Defendants to receive payment for the shares upfront.

h. VACCARO, SVORAI, and others, controlled and directed the issuance of board resolutions authorizing the conversion of notes into free-trading shares of the Manipulated Public Companies.

i. VACCARO, SVORAI, RUGGERI, and others, sought out and provided false, incomplete and fraudulent information to attorneys in order to obtain Rule 144 legal opinions containing misrepresentations to satisfy legal requirements for depositing the stock for sale.

j. VACCARO, SVORAI, and others, deposited and attempted to deposit shares of the Manipulated Public Companies at registered brokers, and if the deposit was rejected, Defendants sought out another broker who would accept the deposit.

k. VACCARO, SVORAI, and others, paid stock promoters and media companies to promote the Manipulated Public Companies at the same time the Defendants and others were depositing large blocks of shares with registered and unregistered brokers.

l. VACCARO, SVORAI, RUGGERI, and others, provided press releases from the Manipulated Public Companies to each other and to co-conspirators in advance of the press release's release date.

m. VACCARO, SVORAI, RUGGERI, and others, caused the creation and release of favorable press releases and other information to promote the Manipulated Public Companies.

n. VACCARO, SVORAI, and others, paid undisclosed commissions and kickbacks to co-conspirators who helped facilitate the sale shares of the Manipulated Public Companies.

o. VACCARO, SVORAI, and others, provided false, incomplete and fraudulent information to attorneys to obtain Rule 144 legal opinions containing misrepresentations to satisfy legal requirements to deposit stock.

p. VACCARO, SVORAI, and others, paid undisclosed commissions and kickbacks to co-conspirators for the repatriation of proceeds of sales of shares of the Manipulated Public Companies sold outside the United States.

q. VACCARO, SVORAI, and others, divided up the proceeds from the sale of shares of the Manipulated Public Companies in accordance with their respective interests in shares sold.

r. SVORAI and VACCARO made threats to kidnap and kill co-conspirators who did not pay them money they believed they were owed.

s. VACCARO, SVORAI, RUGGERI, and others, communicated with co-conspirators and others using interstate wires, including e-mail, and encrypted messaging apps, to discuss manipulative stock trading techniques, payments made and money owed.

t. SVORAI, and others transmitted, and caused the transmission of, interstate wires in the form of falsified invoices for services to receive monies representing the proceeds of sales of shares of the Manipulated Public Companies.

## OVERT ACTS

64.  In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants and others performed the following overt acts, among others, in the Northern District of Ohio, Eastern Division, and elsewhere:

a. On or about June 2, 2014, VACCARO caused the issuance of a Convertible Promissory Note from ELEMENT's (POTN's predecessor) subsidiary Sunrise to Nominee-1 for $1,850,000.

b. On or about July 1, 2015, VACCARO caused Sign N Drive to acquire the June 2, 2014 convertible promissory note in exchange for a promissory note to Nominee-1 for $250,000.

c. On or about March 20, 2016, VACCARO and "Robbielotus" had a conversation on Skype wherein they wrote:

> VACCARO: I'm meeting with a stock promoter today to try and dump some of my stock.  Did [unidentified individual] ever get that guys number. I hate my life.
>
> Robbielotus: We have left messages for guy   he is in panama   but comin back here this week
>
> Robbielotus:  give me best ways for him to reach u   if he calls us   your reg phone number or
> VACCARO: He sounded real when I spoke to him. He takes 50% of what he raises which is crazy but he claims he has international clients that he calls on and and claims he can raise 100's
>
> VACCARO: Best number is the cell 516-474-8080
>
> VACCARO: Email also charlesvac@gmail.com

d. On or about March 29, 2016, VACCARO sent Robbielotus a message on Skype which read, "Didn't forget you. Working all ends against the middle. Coming together will update you by Friday. Getting stock deal moving."

e. On or about April 29, 2016, VACCARO sent Robbielotus a message on Skype which read, "I didn't forget about you. I've been spend all my time trying to raise money for the business. . . . .I finally after a tremendous amount of effort have the stock in position to hopefully recreate what I pulled off in Jan 2014. I got someone to put up some money to buy cars and the lot is operational. Between the stock and our receivables I should be able

22

to get back on track shortly. I ask Dave again about the money he is holding and I keep getting the same bs about he thinks he will be audited because of all the money that went through his account. I will know more by the end of next week on all fronts."

f. On or about March 15, 2016, VACCARO sent Robbielotus a message on Skype which read, "I trying to clear stock to sell and we will be fine."

g. On or about March 18, 2016, VACCARO signed a brokerage application for Sign N Drive with Brokerage-1 which was ultimately rejected because Brokerage-1 identified VACCARO as controlling the POTN stock he was trying to deposit.

h. On or about August 22, 2016, VACCARO signed a brokerage application for Sign N Drive with Brokerage-2.

i. On or about August 31, 2016, VACCARO deposited 7,250,000 shares of POTN for sale.

j. On or about January 18, 2017, VACCARO caused the registration of C Weed Yacht Charter and was listed as president.

k. On or about May 8, 2017, VACCARO, and others, caused the wire transfer of $25,000 from First Capital Venture Co. to Promotion Company-1 account with JP Morgan Chase Bank, ending in 9878.

l. On or about May 15, 2017, VACCARO provided Co-Conspirator-4 an advance copy of a press release for POTN, Diamond CBD, which was released the following day.

m. On or about May 15, 2017, VACCARO and Co-Conspirator-4 sent the following messages on WhatsApp:

> Co-Conspirator-4: .250 bid/.0252. Now. Call me after

> VACCARO: Taking 100 at 25

VACCARO: Sitting at 26

Co-Conspirator-4: After .026 go .03. Let's build there a little

n. On or about May 22, 2017, VACCARO, and others, caused the wire transfer of $25,000 from First Capital Venture Co. to Promotion Company-1 account with JP Morgan Chase Bank, ending in 9878.

o. On or about May 24, 2017, Co-Conspirator-4 sent VACCARO a WhatsApp message, which read, "Talked and explained what to do to [Co-Conspirator-1]. Said it's your call. Wire, deposit. Whatever 7,500 to my interactive account. When u agree I'll send u info. Being proactive. Increasing volume and doubling the price. I did the first 7k out of pocket to show you. And without quick buy response. Now doing it again with new trading support. .10 range I'm working toward."

p. On or about May 31, 2017, VACCARO sent Co-Conspirator-4 a WhatsApp message, which stated, "Research report coming out tomorrow from see thru equities with a target price of $0.26[.]"

q. On or about May 31, 2017, VACCARO sent Co-Conspirator-4 a WhatsApp message, which stated, "Please don't forget to send us on Friday night the detail report of trades last week and this week. We are swamped with shit and will be back in FL on Sunday night. Also buying back Potnetwork Inc. A digital media company we sold a year ago to online media group. We want it back . . . deal should close today."

r. On or about June 9, 2017, VACCARO sent Co-Conspirator-4 a WhatsApp message that read, "[. . .] I'm out of the country with intermittent cell service down here on a cruise. Just heard from [Co-Conspirator-1] and he is telling me that he agreed to two weeks of marketing and he wanted to take a break this week and that he told you that

when he was in LA? He is a bit of a hot head and apparently went off the reservation. I told him that if he is going to have the firm take a break, which I told him I disagree with but it's not my call he should make a clean break today. And pay the agreed amount of $25K per two weeks which is $12,500. I will tell him that I suggest the firm wire you for the past week and then revisit after next week since they have a busy week coming up on the road."

s. On or about June 9, 2017, VACCARO sent Co-Conspirator-4 a WhatsApp message that read, "I have to go but I spoke with [Co-Conspirator-1] and he needs your wire instructions and invoice for the 12,500 and he will get it out today"

t. On or about June 9, 2017, VACCARO sent Co-Conspirator-4 a WhatsApp message that read, "He said he will continue in one to two weeks."

u. On or about June 12, 2017, VACCARO, and others, caused the wire transfer of $25,000 from First Capital Venture Co. to Promotion Company-1's account with JP Morgan Chase Bank, ending in 9878.

v. On or about June 13, 2017, VACCARO caused Co-Conspirator-4 to send him a message on WhatsApp that read, "Ok putting it together. This is premature - Killing me 1.5 months short. That's 3 payments, 6 weeks of buying lined up already for that. I just started this week international clientele. Charlie these are my biggest clients and usually only do stuff over 2.00 range. What a shame. Tell [Co-Conspirator-1] after I receive only the 12,500 I will not continue until he's ready. It's business nothing personal but it's a lot of work to ramp up and now pause. Remember I told you both this is the only thing that can f up everything, nonpayment or stop and go etc. I highly recommend finish your

commitment wit momentum especially what u get ROI. Your call. Sending weeks work shortly tnx."

w. On or about June 21, 2017, VACCARO, and others, caused the wire transfer of $25,000 from First Capital Venture Co. to Promotion Company-1 account with JP Morgan Chase Bank, ending in 9878.

x. On or about July 7, 2017, VACCARO, and others, caused the wire transfer of $25,000 from First Capital Venture Co. to Promotion Company-1 account with JP Morgan Chase Bank, ending in 9878.

y. On or about July 10, 2017, VACCARO provided Co-Conspirator-4, via WhatsApp, a notice of a press release for the following day by POTN and an article on POTN that would be redistributed through an email database.

z. On or about July 11, 2017, VACCARO provided Co-Conspirator-4, via WhatsApp, an advance information of the POTN June Revenue report set for disclosure on or about July 18, 2017.

aa. On or about July 21, 2017, VACCARO, and others, caused the wire transfer from First Capital Venture Co. to Promotion Company-1 account with JP Morgan Chase Bank, ending in 9878, of $25,000.

bb.  On or about July 31, 2017, VACCARO sent Co-Conspirator-4 a WhatsApp message informing him of the release of a POTN/Tommy Chong deal being released the following day.

cc. On or about September 15, 2017, Co-Conspirator-1 caused the registration of Nominee 5's Company in Florida with a principal place of business in Fort Lauderdale, Florida.

dd. On or about October 19, 2017, VACCARO, and others, caused the registration of Sunny Isles Capital, LLC in Florida with a principal place of business in Sunny Isles Beach, Florida.  VACCARO was listed as the registered agent and Sign N Drive was listed as an Authorized Member.

ee. On or about November 10, 2017, VACCARO, and others, caused the wire transfer of $25,000 from First Capital Venture Co. to Promotion Company-1 account with JP Morgan Chase Bank, ending in 9878.

ff. On or about November 24, 2017, VACCARO, and others, caused the wire transfer of $25,000 from First Capital Venture Co. to Promotion Company-1 account with JP Morgan Chase Bank, ending in 9878.

gg. On or about December 8, 2017, VACCARO, and others, caused the wire transfer of $25,000 from First Capital Venture Co. to Promotion Company-1 account with JP Morgan Chase Bank, ending in 9878.

hh. On or about February 2, 2018, RUGGERI caused an email to be sent to the transfer agent for VPOR, to facilitate the cancellation of 750,000,000 shares of VPOR held by S&E Capital. RUGGERI's email signature stated "Dennis Ruggeri, For Vapor Group, Inc., Cell (561) 692-9988."

ii. On or about March 8, 2018, VACCARO and others opened a joint checking account at JP Morgan Chase Bank, ending in 9969, which was funded by a wire transfer from Sign N Drive's JP Morgan Chase Bank account, ending in 5380, in the amount of $19,000.

jj. On or about March 9, 2018, VACCARO caused a wire transfer from the JP Morgan Chase Bank account, ending in 9969, to a law firm to purchase 7,500,000 free trading shares of FNTT (a predecessor of CLCI) for the benefit of Co-Conspirator-2.

kk. On or about September 4, 2018, Co-Conspirator-1 caused Co-Conspirator-1 and another individual to be added as authorized signers to Nominee-6's Wells Fargo Bank account, ending in 9048.

ll. On or about September 18, 2018, VACCARO caused Unregistered Brokerage-4 to wire $253,987.58 to the VACCARO/Co-Conspirator-2 JP Morgan Chase Bank account ending in 9989.

mm. On or about the same date, VACCARO caused the wire transfer of $250,000 from VACCARO's joint JP Morgan Chase Bank account ending in 9989 to the C Weed Yacht Charter JP Morgan Chase Bank account ending in 8815.

nn. On or about September 21, 2018, VACCARO, and others, caused the wire transfer of approximately $249,060 from Unregistered Brokerage-1 to Nominee-6's Wells Fargo account ending in 9048.  The wire transfer reference noted "POTN sharepurch."

oo. On or about October 11, 2018, VACCARO, and others, caused the wire transfer of approximately $501,600 from Unregistered Brokerage-1 to Nominee-6's Wells Fargo account ending in 9048.  The wire transfer reference noted "POTN sharepurch."

pp. On or about October 15, 2018, VACCARO, and others, caused the wire transfer of approximately $65,000 from Sunny Isles Capital's bank account to Distribution Wholesale's JP Morgan Chase Bank account ending 3356.

qq. On or about October 15, 2018, VACCARO, and others, caused two wire transfers of approximately $50,000 and $250,000 from Nominee-6's Wells Fargo account ending in 9048 to Co-Conspirator-1's Wells Fargo account ending in 3473.

rr. On or about the same date, VACCARO, and others, caused another wire transfer of approximately $240,000 from Nominee-6's Wells Fargo account ending in 9048 to Co-Conspirator-1's Wells Fargo account ending in 9037.

ss. On or about October 22, 2018, VACCARO, and others, caused the wire transfer of approximately $100,000 from a Sign N Drive bank account to Distribution Wholesale's JP Morgan Chase Bank account ending in 3366.

tt. On or about October 24, 2018, VACCARO, and others, caused the wire transfer of approximately $60,000 from a Sign N Drive bank account to Distribution Wholesale's JP Morgan Chase Bank account ending in 3366.

uu. On or about October 29, 2018, VACCARO, and others, caused the wire transfer of approximately $7,500 from Distribution Wholesale's JP Morgan Chase Bank account ending in 3366 to Promotion Company-2.

vv. On or about October 31, 2018, VACCARO, and others, caused the wire transfer of approximately $7,500 from Distribution Wholesale's JP Morgan Chase Bank account ending in 3366 to Promotion Company-2.

ww. On or about October 31, 2018, VACCARO, and others, caused the wire transfer of approximately $35,000 from a Sign N Drive bank account to Distribution Wholesale's JP Morgan Chase Bank account ending in 3366.

xx. On or about November 7, 2018, VACCARO, and others, caused the wire transfer of approximately $7,500 from Distribution Wholesale's JP Morgan Chase Bank account ending in 3366 to Promotion Company-2.

yy. On or about November 8, 2018, VACCARO, and others, caused the wire transfer of approximately $35,000 from a Sign N Drive bank account to Distribution Wholesale's JP Morgan Chase Bank account ending in 3366.

zz. On or about November 9, 2018, VACCARO, and others, caused the wire transfer of approximately $7,500 from Distribution Wholesale's JP Morgan Chase Bank account ending in 3366 to Promotion Company-2.

aaa. On or about November 9, 2018, VACCARO, Co-Conspirator 1, and others, caused the wire transfer of approximately $43,500 from Distribution Wholesale's JP Morgan Chase Bank account ending in 3366 to Promotion Company-3.

bbb. On or about November 9, 2018, VACCARO, Co-Conspirator 1, and others, caused the wire transfer of approximately $208,000 from a Sign N Drive bank account to Distribution Wholesale's JP Morgan Chase Bank account ending in 3366.

ccc. On or about November 14, 2018, VACCARO, Co-Conspirator 1, and others, caused the wire transfer of approximately $7,500 from Distribution Wholesale's JP Morgan Chase Bank account ending in 3366 to Promotion Company-2.

ddd. On or about November 16, 2018, Co-Conspirator 1, and others, caused the wire transfer of approximately $456,000, with the notation "Re: POTN," from Unregistered Brokerage-2 to Nominee-6's Wells Fargo account ending in 9048.

eee. On or about the same date, Co-Conspirator 1 caused the wire transfer of approximately $465,000 from Nominee-6's Wells Fargo account ending in 9048 to Co-Conspirator-1's Wells Fargo account ending in 9037.

fff. On or about December 4, 2018, VACCARO, and others, caused the transfer of 2,500,000 POTN shares held in Sign N Drive to Unregistered Brokerage-4.

ggg. On or about December 5, 2018, VACCARO, Co-Conspirator 1, and others caused a bank transfer of approximately $252,836.25 from Unregistered Brokerage-4 to Sign N Drive JP Morgan Chase Bank account ending in 5389 with the reference "POTN 2.5M Share Purchase Balance from Error."

hhh. On or about December 11, 2018, Co-Conspirator 1, and others, caused the wire transfer of approximately $285,600, with the notation "Re: POTN," from Unregistered Brokerage-2 to Nominee-6's Wells Fargo account ending in 9048.

iii. On or about the same date, Co-Conspirator 1 caused the wire transfer of approximately $280,000 from Nominee-6's Wells Fargo account ending in 9048 to Co-Conspirator-1's Wells Fargo account ending in 9037.

jjj. On or about December 12, 2018, Co-Conspirator 1, and others, caused the transfer of 2,000,000 shares from POTN Certificates 700050 and 700051 held in Nominee-6's name, for a total of 4,000,000 shares, to Unregistered Brokerage-2.

kkk. On or about December 28, 2018, Co-Conspirator 1, and others, caused the wire transfer of approximately $187,200, which noted "Re: POTN," from Unregistered Brokerage-2 to Nominee-6's Wells Fargo account ending in 9048.

lll. On or about the same date, Co-Conspirator 1 caused the wire transfer of approximately $190,000 from Nominee-6's Wells Fargo account ending in 9048 to Co-Conspirator-1's Wells Fargo account ending in 9037.

mmm. On or about December 31, 2018, Co-Conspirator 1, and others, caused the transfer of three million shares from POTN Certificate 700037 held in Nominee-6's name to Unregistered Brokerage-2.

nnn. On or about January 3, 2019, VACCARO, and others, caused the transfer of 3,000,000 POTN shares held in Sign N Drive to Unregistered Brokerage-4.

ooo. On or about January 7, 2019, Co-Conspirator 1, and others, caused the wire transfer of approximately $370,800, with the notation "Re: POTN," from Unregistered Brokerage-2 to Nominee-6's Wells Fargo account ending in 9048.

ppp. On or about the same date, Co-Conspirator 1, and others, caused the wire transfer of approximately $375,000 from Nominee-6's Wells Fargo account ending in 9048 to Co-Conspirator-1's Wells Fargo account ending in 9037.

qqq. On or about January 8, 2019, Co-Conspirator 1, and others, caused the transfer of 6,000,000 shares from POTN Certificates 20720, 700044, 700045, 7000046 held in Nominee-6's name to Unregistered Brokerage-2.

rrr. On or about January 14, 2019, Co-Conspirator 1, and others, caused the wire transfer of approximately $340,230, which noted "Re: POTN," from Unregistered Brokerage-2 to Nominee-6's Wells Fargo account ending in 9048.

sss. On or about the same date, Co-Conspirator 1 caused the wire transfer of approximately $340,000 from Nominee-6's Wells Fargo account ending in 9048 to Co-Conspirator-1's Wells Fargo account ending in 9037.

ttt. On or about January 14, 2019, VACCARO, Co-Conspirator 1, and others, caused a bank transfer of approximately $255,000 from Unregistered Brokerage-4 to Sign N Drive JP Morgan Chase Bank account ending in 5389 with the reference "POTN 3M Tranche 2."

uuu. On or about January 16, 2019, Co-Conspirator 1, and others, caused the transfer of 5,500,000 shares from POTN Certificate 700124 held in Nominee-6's name to Unregistered Brokerage-2.

vvv. On January 22, 2019, VACCARO, and others, caused the wire transfer of approximately $48,000 from Sign N Drive JP Morgan Chase Bank account ending in 5389 to the VACCARO/Co-Conspirator-2 JP Morgan Chase Bank account ending in 9969.

www. On or about the same date, VACCARO and others, caused a wire transfer to a Delaware-based limited liability company for the purchase of a convertible note in the amount of $48,750 which was in the name of Co-Conspirator-2.

xxx. On or about February 14, 2019, Co-Conspirator-1, and others, caused the opening of JP Morgan Chase Bank account ending in 1237 for Nominee-7's Company

yyy. On or about February 19, 2019, Co-Conspirator-1 was added as an authorized signer on the Nominee-7's Company JP Morgan Chase Bank account ending in 1237.

zzz. On or about February 20, 2019, Co-Conspirator-1, and others, caused the wire transfer of approximately $633,780, which noted "Re: POTN," from Unregistered Brokerage-2 to Nominee-7's Company JP Morgan Chase Bank account ending in 1237.

aaaa. On or about February 21, 2019, Co-Conspirator-1, and others, caused the wire transfer of approximately $600,000 from Nominee-7's Company JP Morgan Chase Bank account ending in 1237 to Investor Capital JP Morgan Chase Bank account ending in 7519.

bbbb. On or about February 22, 2019, VACCARO and Individual-1 had the following conversation on WhatsApp:

Individual-1: Where is the paper held now?

VACCARO: Some at transfer agent a little at [Brokerage-2] and the rest in convertible notes.

VACCARO: Waiting to be converted and deposited

Individual-1: Selling OTC?

VACCARO: Yes some non-reporting pink. And some full reporting.

VACCARO: Here are the symbols and shares

VACCARO:   Symbol Approx amount
            POTN 300,000,000
            WLAB 55,000,000
            MPGR 30,000,000
            CLCI 130,000,000

VACCARO:   You can do the math.
            All are companies that are and will be as much a success as POTN is.

cccc. On or about February 26, 2019, VACCARO and others, caused the wire transfer of approximately $250,000 from Sign N Drive JP Morgan Chase Bank account ending in 5389 to Nominee-1.

dddd. On or about March 16, 2019, VACCARO sent Individual-1 the following WhatsApp messages:

VACCARO: I'm selling off shares to three parties. One here two in Europe but the numbers are large enough to justify being vertically integrated.

VACCARO: Need to control the whole process

VACCARO: Plus a self clearing BD will be worth big money especially when and if we can introduce crypto clearing

eeee. On or about March 19, 2019, RUGGERI caused an email to be sent to the transfer agent for VPOR, to facilitate the transfer of 100,000,000 shares of VPOR to a Nevada-based limited partnership. RUGGERI's email signature stated "Dennis Ruggeri, For D&D Capital, Inc., Cell (561) 692-9988."

ffff. On or about March 21, 2019, VACCARO sent Co-Conspirator-1 a WhatsApp message that stated, "Can you live with a $40k burn rate down from $75k?? And we need to discuss revenue that seems to be available from you?"

gggg. Between on or about April 3, 2019, through on or about April 6, 2019, SVORAI, Co-Conspirator-1 and "Naples" had the following conversation on WhatsApp:

> Naples: Good evening [Co-Conspirator-1] and Dror. I urgently need money who is paying me the 30k that past due??
>
> Naples: I thought I am suppose to receive the 10k monthly payments from you and you will deal with Dror later
>
> SVORAI: We have an issue Yaniv . . .without PR, we can't sell shares it will take 3 months to get 50k and you not the only one that needs to get paid . . we were supposed to have $160k in PR y now and we have 0 . . so I'm not sure how to help you
>
> Naples: My money wasn't depended on your deal with each other. I agreed to the deal based on the fact that I am getting the 60k quickly and I planned on that money.

hhhh. On or about April 11, 2019, Co-Conspirator-1, and others, caused the transfer of 2,000,000 POTN shares from Nominee-7's Company to Unregistered Brokerage-3.

iiii. On or about April 15, 2019, Co-Conspirator-1, and others, caused a wire transfer of approximately $194,150 from a securities attorney to Nominee-7's Company JP Morgan Chase Bank account ending in 1237 with the reference "Unregistered Brokerage-3."

jjjj. On or about April 16, 2019, RUGGERI provided a transfer agent documents in order to initiate the transfer of 300,000,000 shares of VPOR stock to Co-Conspirator-5.

kkkk. On or about April 17, 2019, Co-Conspirator-1, and others, caused the transfer of 2,000,000 POTN shares from Nominee-7's Company to Unregistered Brokerage-3.

llll. On or about April 18, 2019, SVORAI and RUGGERI caused the transfer of 300,000,000 shares of VPOR stock from D&D Capital to Co-Conspirator-5.

mmmm. On or about April 20, 2019, Co-Conspirator-1 accepted Individual-2 into a WhatsApp chat titled "Sign N Drive."

nnnn. On or about the same date, Co-Conspirator-1 asked VACCARO the name of the company selling shares to Individual-2, and VACCARO responded "Sign N Drive Auto Mall."

oooo. On or about April 23, 2019, VACCARO, Co-Conspirator-1, and others, caused the transfer of 6,000,000 POTN shares to an entity controlled by Co-Conspirator-5.

pppp. On or about April 24, 2019, SVORAI and RUGGERI caused Co-Conspirator-5 to deposit 300,000,000 shares of VPOR to sell into the market.

qqqq. On or about April 25, 2019, SVORAI and RUGGERI caused the wire transfer of $10,000 from HSBC Bank for the Bank of Bermuda account 011-145265-501 to a D&D Capital Bank account at Wells Fargo last four x9454.

rrrr. On or about April 26, 2019, VACCARO sent a WhatsApp message to Co-Conspirator-1 and Individual-2 stating that he (VACCARO) had not received anything and asked them to send SPAs (Share Purchase Agreements) for 2,000,000 shares of WLAB and 6,000,000 shares of POTN.

ssss. On or about April 25, 2019, Co-Conspirator-1 caused a wire transfer of approximately $170,450 from a securities attorney to Nominee-7's Company's bank account ending in 1237 with the reference "Unregistered Brokerage-3."

tttt. On or about April 25, 2019, VACCARO, Co-Conspirator-1, and Individual-2, in a WhatsApp group message, discussed a sales purchase agreement for an additional 1,000,000 shares of CLCI.  VACCARO stated that "Sunny Isles Capital LLC" would be the seller of the shares.

uuuu. On or about April 26, 2019, VACCARO and SVORAI sent the following messages to a group chat that contained VACCARO, SVORAI, Co-Conspirator-1, and RUGGERI:

> VACCARO: Dennis please create a new note from Sign N Drive for $100k

> SVORAI: Yes Dennis . . and also I think what we should do is maybe convert the entire note to restricted shares . .let's talk Monday to see what is better note or shares

vvvv. On April 30, 2019, SVORAI caused the mailing of documents in the name of D&D Capital to a transfer agent to facilitate the transfer of VPOR stock to Co-Conspirator-5.

wwww. On or about May 3, 2019, RUGGERI emailed and caused to be emailed documents that included a Rule 144 Seller's Representation Letter that identified SVORAI as a non-affiliate of VPOR.

xxxx. On or about May 3, 2019, SVORAI and RUGGER caused the transfer of 900,000,000 shares of VPOR stock from D&D Capital to Co-Conspirator-5.

yyyy. On or about May 3, 2019, VACCARO, Co-Conspirator-1, and others, caused the transfer of 6,000,000 shares of POTN previously transferred to the entity by Co-Conspirator-5 back to Co-Conspirator-5.

zzzz. On or about May 6, 2019, VACCARO, Co-Conspirator 1, and others, caused a wire transfer of approximately $238,350 from Unregistered Brokerage-3 to Sign N Drive JP Morgan Chase Bank account ending in 5389 with the reference "POTN 3M."

aaaaa. On or about May 7, 2019, VACCARO and others caused the wire transfer of approximately $200,000 from a Sign N Drive bank account to Distribution Wholesale's JP Morgan Chase Bank account ending in 3366.

bbbbb. On or about May 7, 2019, VACCARO and SVORAI sent the following messages to a group chat between VACCARO, SVORAI, Co-Conspirator-1, and RUGGERI:

> VACCARO: Glendale rejected the MPGR deposit

VACCARO: [F**k] I hate this shit. Need our BD

SVORAI: Ya nasty!! They hate our business

ccccc. On or about May 7, 2019, VACCARO sent an attachment to the WhatsApp group

chat between VACCARO, SVORAI, Co-Conspirator-1, and RUGGERI, containing the

rejection email from Glendale addressed to Co-Conspirator-3.

ddddd. On or about May 8, 2019, SVORAI caused the deposit of VPOR shares to Co-

Conspirator-5's brokerage account for sale in the market.

eeeee. On May 8, 2019, VACCARO, Co-Conspirator-1, and others, caused 6,000,000

shares of POTN to be deposited into a brokerage account controlled by Co-Conspirator-5.

fffff. On or about May 9, 2019, VACCARO, Co-Conspirator-1, and others, caused the

transfer of 6,000,000 POTN shares from Sign N Drive to Unregistered Brokerage-3.

ggggg. On or about May 13, 2019, SVORAI caused a wire transfer of approximately

$112,500.00 from Co-Conspirator-5 to D&D Capital Wells Fargo account ending in

9454.

hhhhh. On or about May 15, 2019, VACCARO, Co-Conspirator 1, and others, caused a

wire transfer of approximately $199,920 from Unregistered Brokerage-3 to Sign N Drive

JP Morgan Chase Bank account ending in 5389 with the reference "3M."

iiiii. On or about May 8, 2019, Co-Conspirator 1, and others, caused a wire transfer of

approximately $144,500 from a securities attorney to Nominee-7's Company JP Morgan

Chase Bank account ending in 1237 with the reference "Unregistered Brokerage-3."

jjjjj. On or about May 14, 2019, SVORAI and Individual-2 had a phone call in which

Individual-2 discussed that Co-Conspirator-1 had Individual-2 working on CLCI and

WLAB. They also discussed market positions of VPOR and GRCV and anticipated impact of upcoming promotions on stock sales.

kkkkk. On or about May 16, 2019, VACCARO, Co-Conspirator-1, and others, caused the wire transfer of $142,448 from HSBC Bank for the Bank of Bermuda account 011-145265-501 to a VACCARO Sign N Drive account at JP Morgan Chase Bank account ending in x5389.

lllll. On or about May 17, 2019, SVORAI and Individual-2 had a phone call in which they discussed that the percentage of the daily value for trading was at 30%. Individual-2 confirmed his role was to deposit shares and work with brokers on behalf of SVORAI, VACCARO and Co-Conspirator-1. SVORAI discussed ownership of VPOR shares by Nominees 2, 3, 4, and 5. SVORAI identified an attorney that could write opinion letters on the paperwork for the sales.

mmmmm. On or about May 20, 2019, VACCARO, Co-Conspirator 1, and others, caused the wire transfer of approximately $300,000 from a Sign N Drive bank account to Distribution Wholesale's JP Morgan Chase Bank account ending in 3366.

nnnnn. On or about May 20, 2019, VACCARO caused the transfer of 6,000,000 POTN shares held by Sign N Drive to Co-Conspirator-5.

ooooo. On or about May 21, 2019, VACCARO caused the deposit of 6,000,000 shares of POTN stock into Co-Conspirator-5's brokerage account to sell into the market.

ppppp. On or about May 21, 2019, VACCARO, Co-Conspirator 1, and others, caused the wire transfer of approximately $206,250 from Distribution Wholesale's JP Morgan Chase Bank account ending in 3366 to a company that ran a stock message board.

qqqqq. On or about May 22, 2019, SVORAI and Individual-2 had a phone call in which they discussed orders that had not been filled during the day, and SVORAI responded "then you have to take bids man, you gotta be a little aggressive."  Individual-2 discussed trading light while the stock is between promotional programs, to be able to trade more aggressive on days SVORAI and Individual-2 knew there would be volume in the market.  SVORAI inquired about [Co-Conspirator 5] who executed the trades.  SVORAI stated "oh he's not a guy that you just use his name," and later "so he's in the business." Individual-2 confirmed that SVORAI's group was going to run light promotion on VPOR the following day.  SVORAI responded, "yeah yeah, they set up for today, they forgot" SVORAI added, "but they are not big" and that the group offered to repay SVORAI or run promotion for two days.  SVORAI later added "tomorrow and Friday will be better than today".  Individual-2 and SVORAI discussed balancing selling between the bid and the offer to avoid too much selling pressure.  SVORAI told Individual-2 "tomorrow, no matter what, try to be at least 25% tomorrow and Friday."

rrrrr. On or about May 23, 2019, VACCARO, Co-Conspirator 1, and others, caused the wire transfer of approximately $360,000 from a Sign N Drive bank account to Distribution Wholesale's JP Morgan Chase Bank account ending in 3366.

sssss. On or about May 23, 2019, Co-Conspirator 1, and others, caused the wire transfer of approximately $209,000 from Distribution Wholesale's JP Morgan Chase Bank account ending in 3366 to Promotion Company-3.

ttttt. On or about May 23, 2019, Co-Conspirator 1 caused a wire transfer of approximately $134,600 from a securities attorney to Nominee-7's Company JP Morgan Chase Bank account ending in 1237 with the reference "Unregistered Brokerage-3."

uuuuu. On or about May 23, 2019, SVORAI caused a wire transfer of approximately $230,000.00 from Co-Conspirator-5 to D&D Capital Wells Fargo account ending in 9454.

vvvvv. On or about May 23, 2019, SVORAI and Individual-2 had a phone call in which they discussed, among other things: (1) how wires were sent from Individual-2 to SVORAI; (2) wire transfers for promotion; and (3) the weekly schedule for promotions of GRCV, POTN and VPOR. SVORAI instructed Individual-2 to send 100,000,000 shares of POTN to Switzerland to be sold.

wwwww. On or about May 24, 2019, Co-Conspirator 1, and others, caused a wire transfer of approximately $132,000 from Nominee-7's Company JP Morgan Chase Bank account ending in 1237 to Investor Capital JP Morgan Chase Bank account ending in 7519.

xxxxx. On or about May 24, 2019, SVORAI and Individual-2 had a phone call where they discussed when wires would be received from Bermuda, as well as the timing of promotions. Individual-2 confirmed he had 500,000,000 shares of GRCV ready to be traded.

yyyyy. On or about May 25, 2019, SVORAI and Individual-2 had a phone call where they discussed how to reconcile sell orders with the physical statements. SVORAI inquired about the delay in wire transfers to repatriate the proceeds from the stock sales.

zzzzz. On or about May 30, 2019, Co-Conspirator 1, and others, caused a wire transfer of approximately $122,200 from a securities attorney to Nominee-7's Company JP Morgan Chase Bank account ending in 1237 with the reference "Unregistered Brokerage-3."

aaaaaa. On or about June 10, 2019, VACCARO and Individual-2 had a phone call in which they discussed using multiple accounts to structure shares. VACCARO stated "I got a question for you, how much uh, how much WLAB can you take, because the maximum, the 5%, is about 4 million shares, do you have two accounts or two different corps?" Individual-2 confirmed the availability of two separate accounts to use and VACCARO later confirmed the accounts were under separate control to evade the 5% rule. Individual-2 told VACCARO that the transfer agent received the medallion for the second block of approximately 2 million shares of WLAB from Co-Conspirator-2. VACCARO stated, "he's one of us, we use him, we use him here and there." VACCARO confirmed Individual-2 had approximately 1.5 million shares remaining of WLAB. VACCARO then stated "you have about a million five left, your picking up let's call it 2 million from [Co-Conspirator-2], right? So you are at three and a half. You can have a total of eight, so um, you have three and a half, I want to give uh, four million to one account, and uh a half a million to the other account." VACCARO requested Individual-2 send VACCARO a share purchase agreement for 4 million shares and stated "I want to load you up because we're gonna, there's, there's going to be some liquidity coming."

bbbbbb. On or about June 3, 2019, VACCARO, Co-Conspirator 1, and others, caused a wire transfer of approximately $240,000 from Co-Conspirator-5 to Sign N Drive JP Morgan Chase Bank account ending in 5389.

cccccc. On or about June 11, 2019, VACCARO, Co-Conspirator-1 and Individual-2, in a WhatsApp group message, discussed WLAB shares in the name of Co-Conspirator-2. VACCARO asked Individual-2 if he had cleared the 1,900,000 shares from Co-

Conspirator-2 and Individual-2 responded that the shares were still pending delivery. Co-Conspirator-1 responded regarding the 1,900,000 WLAB shares, stating that the total shares of WLAB should be 3,900,000 less whatever was sold.

dddddd. On or about June 13, 2019, VACCARO and RUGGERI had the following WhatsApp message exchange:

> VACCARO: When will you WLAB be current??
>
> RUGGERI: Admiral, they are not current for the same reason POTN is not current: [we] will not disclose the personal names of the control people behind entities to which stock has been issued, including Back Nine and Sunny Isles Capital. As we used to say, 'Mexican standoff'

eeeeee. On or about June 16, 2019, RUGGERI sent and caused an email to be sent to a transfer agent for WLAB, to facilitate a conversion request of 5,000,000 shares of WLAB for Sunny Isles Capital. RUGGERI's email signature stated "Dennis Ruggeri, For WLAB., Cell (561) 692-9988."

ffffff. On or about June 17, 2019, VACCARO sent RUGGERI WhatsApp messages that stated, "CLCI wtf"; "Skull and cross bones."

gggggg. On or about June 18, 2019, Individual-2 met with VACCARO, SVORAI, and RUGGERI at a business address in Miami, Florida.

hhhhhh. On or about June 18, 2019, VACCARO and others caused a wire transfer of approximately $120,000 from Co-Conspirator-5 to Sign N Drive JP Morgan Chase Bank account ending in 5389.

iiiiii. On or about June 24, 2019, VACCARO sent Co-Conspirator-1 and Individual-2 an email message with the subject line "Company Info Form" and instructed Co-Conspirator-1 and Individual-2 to set up calls with an undercover agent ("UC-1"). Pursuant to the information form, VACCARO and Co-Conspirator-1 were to create

offshore brokerage and bank accounts in the name of Sunny Isles Capital for trading OTC stocks.  VACCARO and Co-Conspirator-1 were to be directors and equal shareholders in the account.

jjjjjj. On or about June 25, 2019, Co-Conspirator-1 sent VACCARO WhatsApp messages that stated, "You need to go to him home"; "You have 2 million reasons to go see [Individual-2] tomorrow or the next day."

kkkkkk. On or about June 26, 2019, VACCARO sent Co-Conspirator-1 a WhatsApp message that stated, "Spoke with [Individual-2].  Said he will begin sending wires under $100k daily to catch up. Under $100k he said should fly with the bank" . . . "Plus we should be having call with [UC-1] tomorrow."

llllll. On or about June 28, 2019, VACCARO, Co-Conspirator 1, and others, caused a wire transfer of $90,000 from Co-Conspirator-5 to Sign and Drive JP Morgan Chase Bank account ending in 5389.

mmmmmm. On or about July 2, 2019, VACCARO, Individual-2, and UC-1 had a phone conversation in which they discussed a scheme to liquidate shares of stock through offshore brokerage accounts.

nnnnnn. On or about July 4, 2019, VACCARO and others caused a wire transfer of $45,000 from Co-Conspirator-5 to Sign and Drive JP Morgan Chase Bank account ending in 5389.

oooooo. On or about July 12, 2019, SVORAI called Individual-2 to ask about the status of wire transfers and threatened to hire hitmen and have a co-conspirator "hanged by his toes for the night" and "chop him in pieces and throw him in the ocean."

ppppp. On or about July 12, 2019, VACCARO sent a text message to Co-Conspirator-1 that read, "I'm ready to kidnap [Individual-2] and beat the living crap out of him."

qqqqqq. On or about July 16, 2019, SVORAI, Individual-2 and an undercover agent ("UC-2") had a phone conversation in which they discussed a scheme to launder proceeds into the United States of stock/shares liquidated abroad, including the transfer of $60,000 over three consecutive days into SVORAI's bank account. SVORAI and Individual-2 discussed SVORAI providing a consulting agreement as a "cover" for the receipt of the money.

rrrrrr. On or about July 16, 2019, SVORAI sent a text message from the Southern District of Florida to the Northern District of Ohio, Eastern Division, with wire instructions for D&D Capital's Wells Fargo Bank account ending in 9454.

ssssss. On or about July 17, 2019, VACCARO and RUGGERI had the following exchange on WhatsApp:

> VACCARO: I may elect to convert all the notes this week since there is a low print of $0.122 on 06-24-19. At 60% discount that converts to $0.0488 per share."; "It's an additional 2,561,475 shares.
>
> VACCARO: For a grand total of 10,768,957
>
> VACCARO: Which is still under 049%
>
> RUGGERI: Admiral, what is SND's Tax ID Number? Thank you.

tttttt. On or about July 17, 2019, Co-Conspirator-1 and UC-1 had a phone call in which they discussed a scheme wherein UC-1 would sell stock/shares for Co-Conspirator-1, VACCARO, and SVORAI.

uuuuuu. On or about July 17, 2019, SVORAI and others, caused UC-2 to initiate a wire transfer of approximately $20,000 from the Northern District of Ohio, Eastern Division, to D&D Capital's Wells Fargo bank account ending in 9454 in Florida.

vvvvvv. On or about July 17, 2019, SVORAI emailed Individual-2 a consulting agreement between D&D Capital and UC-2's company.

wwwwww. On or about July 18, 2019, Co-Conspirator-1, Individual-2, and UC-1 had a phone call in which they discussed liquidating 704,000,000 shares of VPOR through UC-1's offshore broker-dealer.

xxxxxx. On or about July 18, 2019, SVORAI, Individual-2, and UC-1 had a phone call in which they discussed selling shares of VPOR.

yyyyyy. On or about July 19, 2019, SVORAI, and others caused UC-2 to initiate two wire transfers for approximately $20,000 each, from the Northern District of Ohio, Eastern Division, to D&D Capital's Wells Fargo bank account ending in 9454 in Florida.

All in violation of Title 18, United States Code, Section 371.

COUNT 2-10
(Securities Fraud, 15 U.S.C. §§ 78j(b), 78ff and Title 17 C.F.R. § 240.10b-5)

The Grand Jury further charges:

65.    The factual allegations contained in paragraphs 1 through 59, and 63-64, are re-alleged and incorporated as though fully set forth herein.

66.    On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, defendants CHARLES VACCARO, DENNIS RUGGERI, and others presently known and unknown to the Grand Jury, did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstates commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made untrue statements of material fact, and omitting to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of the securities in PotNetwork Holdings, Inc., each act below constituting a separate count.

| Count | Approx. Dates of Sale to Public | Approx. Amount of Shares of POTN Sold | Ticker Symbol | Defendant(s) Charged | Receiving Account of Proceeds from Broker |
|---|---|---|---|---|---|
| 2 | September 28, 2016 – January 10, 2017 | 7,250,000 | POTN | VACCARO | JPMorgan Chase Acct x5389 |
| 3 | February 9, 2017 – April 11, 2017 | 12,500,000 | POTN | VACCARO | JPMorgan Chase Acct x5389 |
| 4 | April 11, 2017 – July 11, 2017 | 39,000,000 | POTN | VACCARO | JPMorgan Chase Acct x5389 |
| 5 | July 11, 2017 – October 2, 2017 | 42,000,000 | POTN | VACCARO | JPMorgan Chase Acct x5389 |
| 6 | October 2, 2017 – December 29, 2017 | 40,000,000 | POTN | VACCARO | JPMorgan Chase Acct x5389 |
| 7 | March 1, 2018 – May 23, 2018 | 25,000,000 | POTN | VACCARO | JPMorgan Chase Acct x5389 |
| 8 | June 7, 2018 – June 18, 2018 | 3,050,000 | POTN | VACCARO | JPMorgan Chase Acct x5389 |
| 9 | April 24, 2019 | 300,000,000 | VPOR | SVORAI RUGGERI | Wells Fargo x9454 |
| 10 | May 21, 2019 | 6,000,000 | POTN | VACCARO | JPMorgan Chase Acct x5389 |

All in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNT 11

(Conspiracy to Commit Wire Fraud, 18 U.S.C. 1349)

The Grand Jury further charges:

67.     The factual allegations contained in paragraphs 1 through 59, and 63 are re-alleged and incorporated as though fully set forth herein.

68.     From in or around April 2019, through on or about July 19, 2019 in the Northern District of Ohio, Eastern Division and elsewhere, Defendants CHARLES VACCARO, DROR SVORAI, DENNIS RUGGERI, and others presently known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree to devise and intend to devise a scheme and artifice to defraud and to obtain money and property, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signals, signs, pictures and sounds, to wit: emails and messages containing fraudulent contacts and invoices, and wire-transfers of $20,000 sent to SVORAI's D&D Capital account at Wells Fargo Bank, in violation of Title 18, United States Code, Section 1343.

### Objects of the Conspiracy

69.     It was an object of the conspiracy for VACCARO, SVORAI, RUGGERI, and others known and unknown to the Grand Jury to enrich themselves by selling manipulated stock in POTN, VPOR, WLAB, CLCI, CNCC and GRCV using foreign brokerage accounts and obtaining the proceeds of those sales through international wire transfers.

### Manner and Means

It was part of the conspiracy that:

70.     VACCARO, SVORAI, and others, used convertible notes, nominees and co-conspirators to gain control of free-trading shares of the Manipulated Public Companies.

71.     VACCARO, SVORAI, RUGGERI, and Co-Conspirator-1 placed stock with nominees to hide true ownership of shares and conceal their involvement with the sale of stocks.

72.    VACCARO, SVORAI, and others, were authorized signers on bank accounts for nominees and other entities they controlled in order to transfer proceeds of the sale of shares of the Manipulated Public Companies and paid expenses, such as payments to promoters.

73.    VACCARO, SVORAI, RUGGERI, and Co-Conspirator-1 would seek out others to promote stock in the Manipulated Public Companies to artificially avoid the deflation of, maintain the price of, and inflate the share price of, the stock in the Manipulated Public Companies.

74.    VACCARO, SVORAI, RUGGERI, and Co-Conspirator-1 utilized encrypted communications to discuss fraudulent stock sales, ticker symbols and other activity.

75.    VACCARO used companies that he controlled, such as C Weed Yacht Charter, Sign N Drive, and Sunny Isles Capital to receive proceeds of offshore stock sales.

76.    RUGGERI prepared paperwork and agreements, such as Share Purchase Agreements, to effectuate the transfer of stock to individuals and entities that would sell the stock abroad.

77.    VACCARO, SVORAI, RUGGERI and Co-Conspirator-1 provided documents, including those prepared by RUGGERI, to transfer agents to facilitate the transfer of stock to an offshore broker for sale into the market.

### Acts in Furtherance

78.    The acts contained in paragraphs 64(hhhh)-(yyyyyy) are re-alleged and incorporated herein as acts in furtherance.

All in violation of Title 18, United States Code, Section 1349.

COUNTS 12-14
(Wire Fraud, 18 U.S.C. 1343)

The Grand Jury further charges:

79.     The factual allegations contained in paragraphs 1 through 59, and 63-64(hhhh)-(yyyyyy) are re-alleged and incorporated as though fully set forth herein.

80.     From on or about July 2, 2019, through on or about July 19, 2019, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants CHARLES VACCARO, DROR SVORAI, and DENNIS RUGGERI, and others known and unknown to the Grand Jury, knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

81.     On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants, for the purpose of executing and attempting to execute the foregoing scheme and artifice, transmitted and caused to be transmitted, writings, signs, signals, pictures, and sounds by means of wire and radio communication, in interstate commerce, to wit: electronic communications and electronic transfers of funds which Defendants and others caused to be sent to, and received, as described below, each wire communication or transfer of funds constituting a separate count of this indictment:

| Count | Approximate Date | Approximate Amount | Originating Bank | Receiving Bank |
|---|---|---|---|---|
| 12 | July 17, 2019 | $20,000 | Bank of America | Wells Fargo Bank Account ending in 9454 |
| 13 | July 18, 2019 | $20,000 | Bank of America | Wells Fargo Bank Account ending in 9454 |
| 14 | July 18, 2019 | $20,000 | Bank of America | Wells Fargo Bank Account ending in 9454 |

All in violation of the Title 18, United States Code, Section 1343.

COUNT 15
(Conspiracy to Launder Monetary Instruments, 18 U.S.C. § 1956(h))

The Grand Jury further charges:

82.     The factual allegations contained in paragraphs 1 through 59, and 63-64, are re-alleged and incorporated as though fully set forth herein.

83.     From on or about July 2, 2019 through on or about July 19, 2019, in the Northern District of Ohio, Eastern Division, and elsewhere, the Defendants, CHARLES VACCARO, DROR SVORAI, and others, known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

a. to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, Title 15, United States Code, Sections 78j and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5, and conspiracy to commit wire fraud, in violation of Title 18 United States Code, Sections 1349 and 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i), and (a)(2)(B)(i).

**Manner and Means**

84.    It was part of the conspiracy that:

a. VACCARO, SVORAI and others would transfer large blocks of shares in the

Manipulated Public Companies through a person herein identified as UC-1, who was

actually an agent of the Federal Bureau of Investigation working in an undercover

capacity, for sale through offshore brokerage accounts.

b. VACCARO, SVORAI and others would pay UC-1 a fee to sell the shares of

Manipulated Public Company stock.

c. VACCARO, SVORAI and others agreed to utilize a person herein identified as UC-2,

who was actually an agent of the Federal Bureau of Investigation working in an

undercover capacity, to bring proceeds of offshore stock sales back into the United States

and to facilitate the transfer of money to VACCARO, SVORAI and others they believed

they were owed for previous stock sales sold by Co-Conspirator-5 for their benefit.

d. SVORAI entered into a fraudulent consulting agreement with UC-2's company with

wherein false invoices and contracts between SVORAI and UC-2's company would be

used to conceal the true nature of the funds wired from UC-2's accounts to SVORAI,

which would then transfer a portion of the money to VACCARO and others.

e. On or about July 17, 2019, UC-2, located in the Northern District of Ohio, initiated a

wire transfer totaling approximately $20,000 from a government controlled bank account

to D&D Capital, Inc.'s Wells Fargo Bank account ending in 9454.

f. On or about July 18, 2019, SVORAI caused a fraudulent consulting agreement between

D&D Capital and UC-2's company to be drafted and sent from the Northern District of

Ohio to SVORAI and Co-Conspirator-1.

g. On or about July 19, 2019, SVORAI, RUGGERI and others caused an email containing the executed fraudulent consulting agreement to be sent to Individual-2 for delivery to UC-2.

h. On or about July 19, 2019, UC-2, located in the Northern District of Ohio, initiated two wire transfers of approximately $20,000 each from a government controlled bank account to D&D Capital, Inc.'s Wells Fargo Bank account ending in 9454.

All in violation of Title 18, United States Code, Section 1956(h).

### FORFEITURE: COUNTS 1-14

The Grand Jury further charges:

84.     The allegations of Counts 1 through 14, inclusive, are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).  As a result of the foregoing offenses, Defendants CHARLES VACCARO, DROR SVORAI and DENNIS RUGGERI shall forfeit to the United States all property, real and personal, which constitutes - or is derived from - proceeds traceable to the commission of such offenses; including, but not limited to, the following:

a.)     $236,131.05 seized pursuant to the execution of a federal seizure warrant on or about July 22, 2019, from Wells Fargo Bank NA, Account Number xxxxxxxxx9454, in the name of D&D Capital, Inc., and controlled by DROR SVORAI.

b.)     $7,981.00 U.S. Currency seized on or about July 22, 2019, at the offices of DROR SVORAI located on West Dixie Highway in Miami, Florida.

c.)     2016 Range Rover, VIN: SALWV2EF8GA544909.  CHARLES VACCARO purchased this vehicle on or around July, 2017, from Momentum Jaguar and Volvo for

$90,327.79.  Upon its purchase, the vehicle was titled to CHARLES VACCARO.  There are no liens attached to the vehicle.

     d.)    2018 Rolls Royce Dawn, VIN: SCA666D53JU115744.  CHARLES VACCARO purchased this vehicle on or around July, 2018, from Gold Coast Exotic Imports LLC for $376,660.94.  Upon its purchase, the vehicle was titled to CHARLES VACCARO.  There are no liens attached to the vehicle.

     e.)    2019 Porsche 911, VIN: WP0BB2A95KS125806.  CHARLES VACCARO purchased this vehicle on or around March, 2019, from Copans Motors Inc. for $164,481.14.  Upon its purchase, the vehicle was titled to C Weed Yacht Charter LLC, a company controlled by CHARLES VACCARO.  There are no liens attached to the vehicle.

     f.)    2018 Tesla Model S 100D, VIN: 5YJSA1E23JF261390.  CHARLES VACCARO purchased this vehicle on or around July, 2018, from Tesla Motor Corp. for $116,919.83.  Upon its purchase, the vehicle was titled to CHARLES VACCARO.  There are no liens attached to the vehicle.

<u>FORFEITURE: COUNT 15</u>

The Grand Jury further charges:

85.　　The allegations of Count 15 are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(1).  As a result of this offense, Defendants CHARLES VACCARO and DROR SVORAI shall forfeit to the United States all property, real and personal, involved in such offense, and all property traceable to such property.

A TRUE BILL.

Original document  - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.